UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
                              :
GEORGE EDWARD JOHNSTON         :
                              :
v.                            :    CIV. NO. 3:13CV73 (HBF)
                              :
CAROLYN W. COLVIN,            :
COMMISSIONER, SOCIAL SECURITY :
ADMINISTRATION                :
                              :
```

## RECOMMENDED RULING ON CROSS MOTIONS

This action was filed under § 1631(c)(3) of the Social Security Act ("the Act"), 42 U.S.C. § 1383(c)(3), to review a final decision of the Commissioner of Social Security ("the Commissioner"), denying plaintiff's claim for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Plaintiff George Edward Johnston moves for judgment on the pleadings [Doc. #10], while the Commissioner moves to affirm the Commissioner's decision. [Doc. #12].  Plaintiff filed a reply to the Commissioner's motion to affirm. [Doc. #13].

For the reasons that follow, plaintiff's Motion for Judgment on the Pleadings [**Doc. #10**] is **GRANTED in part and DENIED in part**.  Defendant's Motion to Affirm [**Doc. #12**] is **DENIED.**

## I.        LEGAL STANDARD

The scope of review of a social security disability determination involves two levels of inquiry.  The court must first decide whether the Commissioner applied the correct legal principles in making the determination.  Next, the court must

1

decide whether the determination is supported by substantial evidence.  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).  Substantial evidence is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971); Yancey v. Apfel, 145 F.3d 106, 110 (2d Cir. 1998).  The substantial evidence rule also applies to inferences and conclusions that are drawn from findings of fact.  Gonzales v. Apfel, 23 F. Supp. 2d 179, 189 (D. Conn. 1998); Rodriguez v. Califano, 431 F. Supp. 421, 423 (S.D.N.Y. 1977).  The court may not decide facts, reweigh evidence, or substitute its judgment for that of the Commissioner.  Dotson v. Shalala, 1 F.3d 571, 577 (7th Cir. 1993).  The court must scrutinize the entire record to determine the reasonableness of the ALJ's factual findings.  In reviewing an ALJ's decision, the court considers the entire administrative record.  Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996).  The court's responsibility is to ensure that a claim has been fairly evaluated.  Grey v. Heckler, 721 F.2d 41, 46 (2d Cir. 1983).

Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold the ALJ's decision "creates an unacceptable risk that a claimant will be deprived of the right to have h[is] disability determination made according to correct legal principles."  Schaal v. Apfel, 134 F.3d 496, 504 (2d Cir.

2

1987)(citation and quotation marks omitted).  To enable a reviewing court to decide whether the determination is supported by substantial evidence, the ALJ must set forth the crucial factors in any determination with sufficient specificity. Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984).  Thus, although the ALJ is free to accept or reject the testimony of any witness, a finding that the witness is not credible must nevertheless be set forth with sufficient specificity to permit intelligible review of the record.  Williams ex rel. Williams v. Bowen, 859 F.2d 255, 260-61 (2d Cir. 1988).  Moreover, when a finding is potentially dispositive on the issue of disability, there must be enough discussion to enable a reviewing court to determine whether substantial evidence exists to support that finding.  Peoples v. Shalala, No. 92 CV 4113, 1994 WL 621922, at *4 (N.D. Ill. 1994); see generally Ferraris, 728 F.2d at 587.

## II.  ADMINISTRATIVE PROCEEDINGS

Plaintiff filed concurrent applications for DIB and SSI on November 4, 2010, alleging disability beginning October 31, 2008, due to back problems and arthritis (Certified Transcript of the Record, Compiled on April 14, 2013 (hereinafter "Tr.") Tr. 182- 97).  Both applications were denied initially on January 28, 2011 (Tr. 114-21), and on reconsideration on April 21, 2011. (Tr. 124-37).  Plaintiff then requested a hearing before an Administrative Law Judge. (Tr. 138).

On November 10, 2011, Administrative Law Judge ("ALJ")

3

James E. Thomas held a hearing at which plaintiff, represented by a non-attorney claimant representative, testified. (Tr. 40-71, 20-21, 146-63, 176-79).[1]  On November 21, 2011, the ALJ issued an unfavorable decision. (Tr. 22-39).  On November 20, 2012, the Appeals Council denied plaintiff's request for review thereby making the ALJ's November 21, 2011 decision the final decision of the Commissioner.  (Tr. 1-7).  Plaintiff, represented by counsel, filed this timely action for review of the Commissioner's decision.

## III. PLAINTIFF'S APPEAL

On appeal, plaintiff asserts the following arguments in favor of reversal or remand:

1. The ALJ failed to follow the Treating Physician Rule.

2. The ALJ failed to properly evaluate plaintiff's credibility.

3. The Appeals Council failed to consider new and material evidence.

## IV.      SUBSTANTIAL EVIDENCE

### A.   *Hearing Testimony*

#### 1.    **Plaintiff's Testimony**

Plaintiff was born in 1959 and was 52 years old at the time of the hearing. (Tr. 43).   Plaintiff testified that he completed twelfth grade. (Tr. 43).

---

[1] At the hearing, plaintiff was represented by non-attorney representative Carolyn A. Costello. (Tr. 44, 179).  Prior thereto, plaintiff was represented by non-attorney representative Mario A. Davila. (Tr. 122).

Plaintiff testified that for the past fifteen years he worked "eighty percent" as a glazier and construction worker, which involved working with heavy glass and installing mirrors, aluminum frames, and related materials. (Tr. 45).  Plaintiff explained he would carry, with another person, panes of glass that weighed around 250 pounds. (Tr. 45-46).  Plaintiff testified that on average, he would frequently have to lift 100 or 120 pounds on his own. (Tr. 46).  He further testified having to walk or stand most of the day at these jobs, and that he would not sit too often. (Tr. 46-47).

As to the other twenty percent of his work, plaintiff described restoring old Jaguars, including performing the body work, welding, and some mechanics. (Tr. 47).  In performing this work, plaintiff frequently lifted on average twenty five pounds, with the heaviest weight lifted "probably" being fifty pounds. (Tr. 47).  When plaintiff could, he would use equipment to assist with the heavier lifting. (Tr. 47).  Plaintiff testified having to exert force with his arms to operate a jack to lift heavier materials. (Tr. 47-48).  Plaintiff stated he performed this work for roughly six hours. (Tr. 48).  Plaintiff did not supervise anyone, and did not do any paperwork, reports, or use computers. (Tr. 48).

Plaintiff last worked in 2008, and he stopped working because his body could not physically take it anymore. (Tr. 48-

49).[2]  Plaintiff testified experiencing radiating right leg pain, left leg pain, lower back pain, and burning in his shoulder blades. (Tr. 49).  As to plaintiff's shoulder pain, he experiences burning and spasms between both shoulders that is exacerbated by twisting and bending. (Tr. 50). Plaintiff testified that his low back pain is a chronic, dull, aching pain that is aggravated by lifting, twisting, and bending. (Tr. 50). Plaintiff's leg pain consists of a stabbing pain in his right thigh that radiates to his ankle. (Tr. 50).  Plaintiff testified that if he lifts too much, the pain also starts in his left leg, which began eight months prior to the hearing. (Tr. 50-51). Plaintiff can hold a gallon of milk in each hand for fifteen minutes, but after twenty minutes, it aggravates his low back and shoulders. (Tr. 51-52).  Plaintiff is able to walk about three blocks before experiencing increased leg or low back pain. (Tr. 52).  Plaintiff stated he could stand for twenty or thirty minutes before he would have to sit. (Tr. 52). Plaintiff does not have much problems sitting, but after thirty minutes or so, he experiences pain in his shoulder blades and needs to "get up and move." (Tr. 53).

Plaintiff lives in a house with his girlfriend and her son. (Tr. 53).  The house has about fifteen stairs, and plaintiff sometimes has difficulty with them, depending on how his back

---

[2] Plaintiff initially testified that he last worked in 2010, but then clarified after questioning from his representative that he is "messed up" with his dates, and that it would "have to be" 2008 when he last worked. (Tr. 48-49).

6

feels. (Tr. 53-54).  On a typical day, plaintiff will try to go
outside to get some fresh air, or walk the dogs. (Tr. 54).  He
has also been working to restore a 1969 panel truck for the past
three years, including welding. (Tr. 54, 64).  Plaintiff will
work on the truck once every two days. (Tr. 64)  Plaintiff
testified that when he is restoring the truck, he does not lift
more than twenty pounds. (Tr. 54).  Plaintiff also testified
that restoring the truck should have only taken three to six
months, but has taken longer due to increased pain. (Tr. 54-55).
Plaintiff can work on task for thirty minutes, before having to
take a break for pain. (Tr. 55). Sometimes he is able to return
to the task, depending on how his back feels. (Tr. 55).
Otherwise, plaintiff testified to spending six hours of his day
watching television and relaxing. (Tr. 55-56).

Plaintiff's medication, at the time of the hearing
Oxycodone, and prior thereto, OxyContin, makes him drowsy. (Tr.
56).  Plaintiff stated that the drowsiness causes him to take a
nap every day for an hour or so. (Tr. 56).  Plaintiff also has a
hard time sleeping at night as a result of his pain.  (Tr. 56).
Plaintiff stated that on a scale of 1 to 10, with 10 being the
worst, he experiences a pain level of "8", without his
medication, and "5", with his medication. (Tr. 56-57).

Plaintiff testified that in June 2010 he helped a friend
set up for an antique show, which entailed moving small boxes.
(Tr. 57-58).  In 2009, as a result of losing his home, plaintiff

7

had to move all of his belongings into a "pod." (Tr. 58).
Plaintiff stated that he did not move any furniture or heavy
items, and did what he could do on the "lighter end." (Tr. 58).
After the move, plaintiff went to the doctor due to increased
pain. (Tr. 58).

With respect to his medications, plaintiff testified that
in April, he was started on "high doses of OxyContin in the
morning, 80 milligrams, two in the morning, two in the afternoon
with 10 to 12, 30 milligrams Oxycodone through the day." (Tr.
59). Plaintiff testified that Dr. Schwarz "fabricated saying"
that he was sending plaintiff to Connecticut Spine and Support
to manage plaintiff's care. (Tr. 59, 61).[3] Plaintiff
subsequently saw a "D.O." at Connecticut Spine and Support, who
administered a shot in plaintiff's lower back. (Tr. 59-60).
After receiving the shot, plaintiff experienced severe pain down
his right leg, causing plaintiff to go to the emergency room,
where he received a muscle relaxer. (Tr. 59). Plaintiff
testified that he "got in trouble" with the D.O. for violating
the contract, and that she questioned the amount of medication
she was providing to plaintiff, and ultimately stopped
prescribing him medication. (Tr. 59-60). Plaintiff stated that
after this, nobody wanted to help him, and "everybody's answer
at that time was to go to the emergency room." (Tr. 60). At the
time of the hearing, plaintiff was being treated by Salati

---

[3] The fabrication apparently resulted from plaintiff only receiving a
consultation, and not receiving "full-term" care. (Tr. 61).

Patel, and last saw Dr. Schwarz in August. (Tr. 62).  Plaintiff also takes Keppra (sic) for seizures. (Tr. 70).

In response to whether plaintiff ever lost any jobs as a result of taking pain medications or other drugs, plaintiff answered, "I don't believe it was because of that." (Tr. 60). Plaintiff further responded that the insurance company deemed him a liability, and that he was laid off for lack of work. (Tr. 60).  Plaintiff also stated that he was laid off for lack of work because he could not perform the job anymore. (Tr. 61). Plaintiff is unable to work due to pain, which starts when "his feet hit the floor" in the morning.  (Tr. 62-63).  Plaintiff used to weigh 320 pounds, and testified that he lost 40 pounds, which has helped a little with the pain. (Tr. 63).

Plaintiff stated that he does not have any limitations in the strength of his arms or hands.  (Tr. 63).  Although plaintiff lost a part of a finger, he testified that this has not hampered him from working in the past. (Tr. 63).  Plaintiff further testified that he would be unable to work at a job that allowed him to sit and stand as much as he wanted due to his pain medication. (Tr. 64).  Although Dr. Schwarz's reports fail to indicate any reported side effects from plaintiff's medications, plaintiff testified experiencing drowsiness while taking OxyContin. (Tr. 64).

## 2.  **Vocational Expert Testimony**

Vocational Expert ("VE"), Warren Maxim, also testified at

9

the hearing. (Tr. 65, 164-66). Mr. Maxim classified plaintiff's past work at the medium, heavy, and very heavy exertional levels. (Tr. 66). Mr. Maxim opined that a hypothetical individual of plaintiff's same age, vocational background, and educational level, who can work at the light exertional level with occasional climbing of ramps and stairs; no climbing of ropes, ladders, and scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling, who requires a sit/stand option, and could not work in an environment with exposed hazards, would not be able to perform any of plaintiff's past relevant work. (Tr. 66-67). The VE testified that jobs available nationally and in Connecticut for such a hypothetical individual include a parking lot attendant and a ticket seller, both classified at the light exertional level. (Tr. 67). The VE also testified that the job of toll collector is also available nationally, but not in the state of Connecticut. (Tr. 68). The VE stated that the availability of the sit/stand option in these positions is based on his experience and significant work with the DOT and placement of individuals. (Tr. 68). The VE testified that if the same hypothetical individual's exertional level were reduced to sedentary, there would not be any skills that would transfer to a sedentary exertional level. (Tr. 68). On examination by plaintiff's representative, the VE testified that the hypothetical individual, if absent more than three times per month, would not

be able to sustain the jobs for very long.  The VE testified that although the hypothetical individual would be able to obtain the job, he may not be able to sustain the job. (Tr. 69).

### B.   ALJ's Decision

Under the Social Security Act, every individual who is under a disability is entitled to disability insurance benefits. See 42 U.S.C. § 423(a)(1)(E). "Disability" is defined as an "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected… to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

Determining whether a claimant is disabled requires a five-step process. See 20 C.F.R. § 404.1520. First, the ALJ must determine whether the claimant is currently working. See 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is currently employed, the claim is denied. See 20 C.F.R. § 404.1520(b). If the claimant is not working, as a second step, the ALJ must make a finding as to the existence of a severe mental or physical impairment; if none exists, the claim is also denied. See 20 C.F.R. § 404.1520(c). If the claimant is found to have a severe impairment, the third step is to compare the claimant's impairment with those in Appendix 1 of the Regulations [the "Listings"]. See 20 C.F.R. § 404.1520(d); Bowen v. Yuckert, 482 U.S. 137 (1987); Balsamo, 142 F.3d at 79-80. If the claimant's impairment meets or equals one of the impairments in the

Listings, the claimant is automatically considered disabled. <u>See</u>
20 C.F.R. § 404.1520(d); <u>see also</u> <u>Balsamo</u>, 142 F.3d at 80. If
the claimant's impairment does not meet or equal one of the
listed impairments, at a fourth step, he will have to show that
he cannot perform his former work. <u>See</u> 20 C.F.R. § 404.1520(e)-
(f). If the claimant shows he cannot perform his former work,
the burden shifts to the Commissioner to show that the claimant
can perform other gainful work. <u>See</u> <u>Balsamo</u>, 142 F.3d at 80
(citations omitted). Accordingly, a claimant is entitled to
receive disability benefits only if he shows he cannot perform
his former employment, and the Commissioner fails to show that
the claimant can perform alternate gainful employment. <u>See</u> 20
C.F.R. § 404.1520(f); <u>see also</u> <u>Balsamo</u>, 142 F.3d at 80
(citations omitted).

     The Commissioner may show a claimant's Residual Functional
Capacity by using the Medical-Vocational Guidelines set forth in
the SSA Regulations ["the Grid"]. <u>See</u> 20 C.F.R. § 416.945(a)
(defining "residual functional capacity" as the level of work a
claimant is still able to do despite his or her physical or
mental limitations). The Grid places claimants with severe
exertional impairments, who can no longer perform past work,
into employment categories according to their physical strength,
age, education, and work experience; the Grid is used to dictate
a conclusion of disabled or not disabled. A proper application
of the Grid makes vocational testing unnecessary.

However, the Grid covers only exertional impairments; nonexertional impairments, including psychiatric disorders, are not covered. See 20 C.F.R. Part 404, Subpart P, App. 2, 20 C.F.R. § 200.00(e)(1). If the Grid cannot be used, i.e., when nonexertional impairments are present or when exertional impairments do not fit squarely within Grid categories, the testimony of a vocational expert is generally required to support a finding that employment exists in the national economy which the claimant could perform based on his residual functional capacity. See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996).

Following the five step evaluation process, ALJ Thomas concluded that plaintiff was not disabled under the Social Security Act. (Tr. 25). At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since October 31, 2008, the alleged onset date. (Tr. 27). At step two, the ALJ found that plaintiff had severe impairments of degenerative disc disease and epilepsy. (Tr. 28). The ALJ also found that plaintiff suffered non-severe impairments including, Chronic Obstructive Pulmonary Disease ("COPD"), hypertension, atrial fibrillation, obstructive sleep apnea, and loss of a portion of his finger. (Tr. 28). The ALJ further noted that plaintiff's representative alleged plaintiff suffers from depression and clonus, but found that there is no evidence that such impairments are medically determinable. (Tr. 28).

13

At step three, the ALJ found that plaintiff's impairments, either alone or in combination, did not meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. (Tr. 17).  Before moving onto step four, the ALJ found plaintiff had the residual functional capacity ("RFC") to perform:

> […] light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except: the claimant can only occasionally climb ramps or stairs; the claimant can never climb ladders, ropes, or scaffolds; the claimant can only occasionally balance, stoop, kneel, crouch, or crawl; the claimant requires a "sit/stand option" while at work; finally the claimant cannot work in an environment which would expose the individual to hazards such as exposed moving parts or unprotected heights.

(Tr. 29). In making the RFC determination, the ALJ considered plaintiff's subjective complaints and found that plaintiff's testimony surrounding his abilities and his activities of daily living do not support the alleged extent of his limitations. (Tr. 29-30).  The ALJ further noted that plaintiff's treatment history supports finding significant limitations in his functional abilities, just not to the extent alleged by plaintiff. (Tr. 30).  In making his credibility assessment, the ALJ also noted that plaintiff's behavior during a certain period of time is "more consistent with drug seeking behavior than with the disabling levels of pain alleged." (Tr. 32)

At step four, the ALJ found that plaintiff is not capable of performing any past relevant work. (Tr. 34).  At step five, considering the plaintiff's age, education, work experience, and RFC, the ALJ found that there are jobs that exist in significant

numbers in the national economy that plaintiff could perform. (Tr. 34-35).  Ultimately, the ALJ found plaintiff not disabled from October 31, 2008 through the date of the ALJ's opinion. (Tr.  35).

### C.    Activities of Daily Living report dated December 13, 2010 (Tr. 216-34).

On December 13, 2010, plaintiff submitted an activities of daily living report.  Plaintiff lives in a house with friends. (Tr. 216).  What plaintiff can do every day depends on his pain, but generally he walks the dogs, tends the fire in the winter, and does small jobs. (Tr. 231).  Plaintiff takes care of three dogs and one cat; he feeds the animals once per day and walks the dogs around the yard three or four times per day. (Tr. 231). Plaintiff prepares all of his own meals. (Tr. 232).

Plaintiff reported taking the following medications: Levetiracetam, 1000 mg, one tab twice per day; Metoprotal tarrate (sic), 50 mg, one tab twice per day; Warfarin SOD (sic), 5 mg, one tab once per day; Quinapril (sic), 40 mg, one tab once per day; Ferosemoe (sic), 40 mg, one tab once per day; Morphine Sulfate, 60 mg, one tab three times per day; and Oxycodone, 30 mg, one tab every four hours. (Tr. 232).

Prior to his condition, plaintiff used to enjoy partridge and deer hunting, restoring old cars, and tending a vegetable garden, but he can no longer do these things. (Tr. 217). Plaintiff's conditions affect his sleep because his leg and shoulder pain prevent him from getting comfortable. (Tr. 217).

Plaintiff has a hard time putting on his socks and washing his lower legs and feet. (Tr. 217).  Plaintiff also reports having difficulty using the toilet because his back spasms when he twists to wipe himself, causing severe pain. (Tr. 217). Plaintiff can rake leaves for short intervals, but is unable to shovel snow or dirt. (Tr. 218).  Plaintiff states he can do most other household chores that do not involve heavy lifting or twisting. (Tr. 218).  Plaintiff reports going outside for two to four hours. (Tr. 218).

Plaintiff drives, and shops in stores for food one to two times per week, for a half an hour at a time. (Tr. 218-19). Plaintiff's hobbies include reading and watching TV. (Tr. 219). Plaintiff states that he does not spend time with others, and that he "pretty much stay[s] at home" since his condition began. (Tr. 220).

Plaintiff believes that his condition affects his ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, and complete tasks. (Tr. 220).  Plaintiff states that he can only lift twenty pounds, he cannot squat, bending increases his pain, he cannot stand for a long time, that when he reaches over his head his back spasms, he needs to rest after walking for twenty minutes, if he kneels down, he needs help getting up, when climbing stairs he needs to stop due to pain, and he complete tasks according to his pain that day. (Tr. 220).

After walking for twenty minutes, plaintiff needs to rest

16

for five to ten minutes before he can resume walking. (Tr. 221).
Plaintiff occasionally uses a cane for walking, and uses glasses
to read. (Tr. 221).  Plaintiff does not have a problem paying
attention, or following instructions.  (Tr. 221).  Plaintiff
also reports getting along well with authority figures and
handling stress very well. (Tr. 221).  Plaintiff indicates he
has a fear of financial and health problems. (Tr. 221).

Plaintiff states that he injured his back in 1993,
resulting in surgery.  (Tr. 222).  Plaintiff returned to his job
after surgery, but was "let go" as a result of plaintiff's
condition being a liability for plaintiff's employer. (Tr. 222).
Plaintiff's past work includes that of a glazier, a metal
fabricator, and an auto restorer. (Tr. 223, 263).  All of these
jobs involved significant physical labor, including frequently
lifting fifty to one hundred pounds. (Tr. 224-30).

### D.   *Medical Evidence*

Plaintiff alleges he is disabled on account of a number of
physical impairments. A summary of the relevant medical evidence
in the record follows.

### 1.   Yale New Haven Hospital Records (Tr. 273-94)

Medical records from Yale New Haven Hospital indicate that
plaintiff received a surgical L5-S1 interbody fusion on June 28,
1999. (Tr. 276-79). The excised portions of plaintiff's L5-S1
showed degenerative changes. (Tr. 273).  Following plaintiff's
surgery, he was transferred to the Cardiothoracic Intensive Care

Unit for observation in light of his respiratory status and history of COPD. (Tr. 276).  Records indicate that plaintiff suffered an infection of the incision site, and underwent a debridement and skin closure. (Tr. 276-77). Plaintiff also had an appendectomy shortly after his spinal fusion surgery. (Tr. 274, 276-77). Plaintiff was hospitalized for nineteen (19) days. (Tr. 276-79).

### 2.  **Windham Community Memorial Hospital Records (Tr. 295-537)**

Between May 31, 2009 and November 7, 2010 plaintiff was seen by the Windham Community Memorial Hospital Emergency room fifteen times for back pain and/or to refill his pain medication.  (Tr. 295-344, 372-537).  Plaintiff weighed between 115 and 136 kg[4] at these visits, and sometimes exhibited elevated blood pressure (Tr. 304, 316, 330, 342, 381, 393, 405, 420, 432, 443, 461).

On May 31, 2009, plaintiff was seen by the Emergency Department for low back pain that radiated down his right leg. (Tr. 295, 204).  Plaintiff complained of moderate, constant pain that he assessed as a 7-8, or severe.  (Tr. 299, 304).  He advised ER staff that he was out of his medication, which he would refill the next day. (Tr. 299).  Plaintiff also admitted to taking extra medication "a couple of times" (Tr. 299), and that he takes Oxycodone "all the time." (Tr. 303).  Records

---

[4] Converted to pounds, plaintiff weighed between 253 and 300 pounds at these visits.

indicate that plaintiff had a normal gait, and back flexion of 90. (Tr. 299). Plaintiff has a history of smoking. (Tr. 299). Plaintiff was prescribed one days' worth of 30 mg Oxycodone. (Tr. 299).

Emergency Department records from July 4, 2009 also indicate that plaintiff was seen for chronic back and leg pain. (Tr. 307, 316).  Plaintiff reported moderate pain, and stated that he had run out of his medication. (Tr. 311).[5]  Plaintiff also reported cramping in his left thigh. (Tr. 315-16). Plaintiff's physical exam showed a normal gait and back flexion to 90. (Tr. 311).  Plaintiff was diagnosed with back pain, and given a prescription for fifteen 30 mg Oxycodone tablets. (Tr. 312-13, 318).  The Emergency Room referred plaintiff to FQHC Generations Family Health Center, Inc. for management of plaintiff's chronic back pain. (Tr. 319).  On July 29, 2009, plaintiff tested positive for opiates in his urine. (Tr. 320).

Plaintiff was again seen by the Emergency Department for back pain and a medication refill on November 29, 2009. (Tr. 321, 324-25).  Plaintiff presented with severe soreness and reported that he took his last Oxycodone the night prior. (Tr. 325, 330).  Plaintiff requested a refill of his medication "for a long time." (Tr. 325). Plaintiff's physical exam showed a normal gait and back flexion to 90, with "slight pain to palp" on his back. (Tr. 325). A bilateral leg lift to thirty degrees

[5] Plaintiff's reported pain levels are inconsistent for this visit.  For example, although plaintiff reported moderate pain, he ranks his pain as a 7-8, which is considered "severe." (Tr. 311, 316).

caused pain. (Tr. 325).   Plaintiff ambulated without difficulty. (Tr. 329). Plaintiff received a secondary diagnosis of hypertension. (Tr. 326). Plaintiff was given another prescription for fifteen 30 mg Oxycodone tablets. (Tr. 328, 332).

The Emergency Department next saw plaintiff for back and leg pain on December 25, 2009. (Tr. 333).  Plaintiff requested a one-day refill of Oxycodone, as he had run out the night prior and forgot to call in his refill. (Tr. 337, 342).  Plaintiff reported an acute onset of moderate, achy symptoms. (Tr. 337, 342). Plaintiff's physical exam revealed diffuse tenderness of his lumbar spine. (Tr. 337).  Plaintiff was given three 30 mg Oxycodone tablets. (Tr. 340).

On March 14, 2010, plaintiff presented to the Emergency Department with question of syncope[6] versus presyncopal episode. (Tr. 345-46).  Plaintiff felt weak while at home, lost consciousness and fell to the ground. (Tr. 348, 351). Plaintiff was admitted to the hospital for seven days. (Tr. 346). Plaintiff's discharge summary notes problems of chronic atrial fibrillation, hypertension, spinal fusion, "history of use of massive doses of opiate medications with opiate dependence and opiate abuse," and "questionable history of obstructive sleep apnea." (Tr. 346).  A history of osteoarthritis is also noted.

---

[6] Syncope is a brief loss of consciousness caused by a temporary decrease in blood flow to the brain. http://my.clevelandclinic.org/heart/disorders/electric/syncope.aspx (last visited on February 6, 2014).

(Tr. 348).  At his admission, plaintiff was taking the following medications: 60 mg OxyContin, Coumadin, Quinapril, Lasix, and Metroprolol. (Tr. 346, 348).  On physical examination, plaintiff had significant wheezing and decreased breath sounds. (Tr. 348).  Plaintiff's urine tested positive for opiates on March 17, 2010. (Tr. 362).  While admitted, plaintiff received diagnostic imaging on his sinuses (Tr. 366), and carotid system (Tr. 367).  Plaintiff also had a stress myocardial perfusion imaging study, which indicated "[p]robably normal myocardinal perfusion single isotope SPEC imaging test after Persantine indusion." (Tr. 368).

Plaintiff was discharged with the additional medication of Keppra, recommended by his neurologist to treat seizure symptoms. (Tr. 346-47).  Plaintiff was "strongly advised not to drive, not to use stairs or do any heavy exercise because of his body habitus, questionable ongoing seizure activity and multiple medial problems." (Tr. 346).  Plaintiff was given the following diagnoses: ongoing myoclonic jerks most likely secondary to seizure activity as well as obstructive sleep apnea, opiate dependence and abuse with chronic low back pain, ongoing cigarette smoking and medication non-compliance, morbid obesity, and chronic bilateral leg fluid retention. (Tr. 346).

At the hospital, an EEG was performed on plaintiff, which suggested seizure activity. (Tr. 346).  Plaintiff requested high doses of OxyContin while admitted, and after discussions with Dr. Schwarz, it was decided to keep plaintiff on 30 mg of

21

OxyContin. (Tr. 347).  The attending physician observed plaintiff walking without distress and going out to smoke throughout plaintiff's hospitalization. (Tr. 347).  The attending physician recommended plaintiff have a sleep study in light of plaintiff feeling tired in the morning after being unable to sleep throughout the night, and experiencing other apnea symptoms, such as snoring and difficulty breathing. (Tr. 347-48, 351-52).  A neurologist who examined plaintiff further opined that plaintiff's suspected seizure-like activity could be "directly related to his inability to have adequate cerebral perfusion due to intermittent sleep apnea." (Tr. 353).  Plaintiff also had a surgical consultation on March 19, 2010 to evaluate his larynx. (Tr. 349).

Plaintiff next presented at the Emergency Department on April 18, 2010 for a medication refill. (Tr. 372).  Plaintiff reported an acute onset of mild symptoms, and reported his pain level as "0 – No Pain." (Tr. 376, 281).  Plaintiff was discharged with prescriptions for six 30 mg Oxycodone tablets, and two days' worth of Levetiracetam.[7] (Tr. 379, 383).

Plaintiff also sought medication refills from the Emergency Department on May 16, 2010, claiming that he ran out, and was due for a refill the following day. (Tr. 384).  Plaintiff reported severe, chronic low back pain radiating into his right leg that is exacerbated by movement. (Tr. 388, 393).

---

[7] Levetiracetam is the generic name for Keppra.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699059.html (last visited on February 6, 2014).

Plaintiff's physical examination noted obesity and back flexion to 90. (Tr. 388).  Plaintiff was diagnosed with chronic low back pain, with a secondary diagnosis of hypertension. (Tr. 389). Plaintiff was discharged with eight 30 mg Oxycodone tablets. (Tr. 395).

Plaintiff next sought medication refills on July 20, 2010. (Tr. 396).  Plaintiff reported moderate achy back pain, with no radiating symptoms. (Tr. 400).[8] Plaintiff also stated that the pain management he had seen that morning did not prescribe him pain medication, and he sought pain control. (Tr. 405). A physical examination of plaintiff's back showed a decreased range of movement and tenderness. (Tr. 400). Plaintiff moved about the exam room without difficulty, and presented a steady gait. (Tr. 404).  Plaintiff was discharged with sixteen 30 mg Oxycodone tablets. (Tr. 407).

On July 20, 2010, plaintiff also received a pain management consultation from Dr. Craig E. Foster. (Tr. 409-10).[9]  Dr. Foster notes that plaintiff has a long history of low back pain, and presents with ongoing severe back pain radiating into his right lower leg. (Tr. 409). Plaintiff rates his pain as a 10 on a scale of 0-10 without his medication, and slightly less with Oxycodone. (Tr. 409).  Plaintiff was previously taking 80 mg or more of OxyContin, twice per day. (Tr. 409).  Dr. Foster notes

---

[8] Again, treatment notes are inconsistent with respect to plaintiff's reported pain levels.  Although plaintiff reported moderate pain (Tr. 400), other records from this same date indicate plaintiff's pain scale as a "9-10 Unbearable." (Tr. 405).

[9] This record repeats at Tr. 869-70.

that plaintiff has a "significant narcotics tolerance" with
mixed response. (Tr. 409).  Dr. Foster states that a short
acting medication, like Oxycodone, is inappropriate under the
circumstances where plaintiff suffers twenty-four hour chronic
pain, and he would instead recommend a longer acting narcotic,
such as OxyContin. (Tr. 409).  Dr. Foster does not recommend
further epidural steroid injections, given plaintiff's failure
to respond to such treatment in the past. (Tr. 409).
Ultimately, Dr. Foster suggested Lyrica, in conjunction with a
long-acting narcotic, for plaintiff's pain control, but left it
in Dr. Khalid's discretion as to what to prescribe. (Tr. 409).

The following day, July 21, 2010, plaintiff was seen again
at the Emergency Department for chronic, severe back pain. (Tr.
411, 415).  Plaintiff complained of severe pain in his upper
back that radiated to his right leg, which had been ongoing
since his spinal fusion in 1999. (Tr. 420).  Plaintiff reported
that his primary care physician, Dr. Khalid, refused to
prescribe narcotics, and he did not know what to do in the
meantime for pain management. (Tr. 415).  Plaintiff requested
100 tablets of Oxycodone or OxyContin. (Tr. 415).  Emergency
Department staff discussed with plaintiff options to detox off
of his medication, but plaintiff refused. (Tr. 415).  Dr. Khalid
spoke to emergency department staff and advised that plaintiff
was not to receive any further narcotics, and that there was to
be a meeting with the patient, pain management, and Dr. Glasser.

(Tr. 416). Plaintiff was discharged with eight 30 mg tablets of Oxycodone. (Tr. 422).

The next day, plaintiff presented at the Emergency Department with complaints of back pain. (Tr. 423, 427). Plaintiff reported symptoms of achy, moderate, constant pain that improved with OxyContin. (Tr. 427). An exam of plaintiff's back showed "Lumbar B tender paraspinal decreased range of motion." (Tr. 427). Although plaintiff was taken to an exam room in a wheelchair, he left ambulatory. (Tr. 431). Plaintiff reported his pain as a "9-10 Unbearable." (Tr. 432).

Plaintiff was next seen by the emergency department on August 21, 2010, where he reported moderate lumbar back pain that radiated to his right side, and vomiting from morphine. (Tr. 439).[10] Plaintiff requested a prescription for three days' worth of Oxycodone. (tr. 439). Plaintiff's straight leg tests were negative on the left and right sides, although he did have back tenderness and decreased range of motion. (Tr. 439). Plaintiff did not appear in distress and was able to ambulate to the exam room. (Tr. 442). Plaintiff was discharged with ten 30 mg tablets of Oxycodone. (Tr. 445).[11] Less than a month later, on September 18, 2010, Plaintiff presented at the Emergency Department for a medication refill. (Tr. 448).[12] On physical exam, plaintiff had back flexion to ninety degrees. (Tr. 448).

---

[10] Records for this visit repeat at Tr. 639-49.
[11] Plaintiff's treatment notes indicate that plaintiff returned to the emergency department after discharge because he was prescribed 5 mg Oxycodone, and plaintiff reported that he had previously been taking 30 mg. Plaintiff's prescription was changed accordingly. (Tr. 439).
[12] Records from this visit repeat at Tr. 650-58.

Plaintiff reported moderate back pain. (Tr. 453).  Plaintiff was discharged with six 30 mg tablets of Oxycodone. (Tr. 455).

On October 18, 2010, plaintiff was again seen by the Emergency Department for complaints of severe left leg pain, and chronic low back pain radiating into his left leg. (Tr. 456, 461).[13]  Plaintiff reported running out of Oxycodone. (Tr. 456).  Plaintiff's physical examination indicated "minimal lumbar paraspinous tenderness" and back flexion to ninety. (Tr. 456).  Plaintiff was discharged with ten 30 mg tablets of Oxycodone. (Tr. 463).

On November 6, 2010, plaintiff presented to the Emergency Department with complaints of moderate to severe back pain and radiating symptoms to his right leg. (Tr. 468, 473).[14]  Plaintiff reported that he ran out of pain medication. (Tr. 468).  At discharge, plaintiff was ambulatory and not in any distress. (Tr. 472).  Plaintiff was prescribed fourteen 30 mg tablets of Oxycodone. (Tr. 475).  The clinical notes from this visit state, "Erin from Walgreens pharmacy telephones to report that plaintiff had oxycodone (sic) 30mg tab prescription filled 11/1 and 11/4 for 50 tabs each.  Pharmacist states she will not fill today's prescription." (Tr. 468).  Thereafter, plaintiff returned to the Emergency Department asking for a new prescription so that he could take it to another pharmacy. (Tr. 469).  Plaintiff stated he was afraid he would suffer withdrawal

_____

[13] Records from this visit repeat at Tr. 660-68.
[14] Records from this visit repeat at Tr. 500-11, and 669-80.

symptoms, and requested to be admitted to the hospital for the weekend. (Tr. 469).  The attending physician instead offered a pre-pack weekend supply of Vicodin, which plaintiff accepted. (Tr. 469, 475).

Plaintiff appeared at the emergency department the next morning, November 7, 2010, complaining of severe lower back pain.  (Tr. 480).[15]  Plaintiff reported finishing the Vicodin that the Emergency Department had given him the day before at approximately 7:00 p.m. (Tr. 471, 480). Plaintiff is "on" fifty pills of 30 mg Oxycodone per month, and twenty-one pills of morphine per month. (Tr. 480). Plaintiff's straight leg tests were negative on the left and right sides, and he had back flexion to ninety. (Tr. 480). At this visit, plaintiff suffered an atrial fibrillation and was placed on a heart rate monitor. (Tr. 480-82, 484). Plaintiff's EKG noted an abnormal ECG, but no significant change with his ECG from March 13, 2010. (Tr. 497). He also received medication for this condition. (Tr. 486-87). Plaintiff had a steady gait, and ambulated to the exam room without difficulty. (Tr. 484).

An Automated Rx Reporting System from the Connecticut Department of Consumer Protection dated November 7, 2010, provides a history of plaintiff's prescriptions from November 2009 through October 26, 2010. (Tr. 488-93).[16]  During this period, plaintiff received a large number of both Oxycodone and

---

[15] Records from this visit repeat at Tr. 512-37, and 681-708.
[16] This report repeats at Tr. 524-30, and 693-99.

Morphine prescriptions, often within close proximity of one another. (Tr. 488-93).  According to the Court's count, plaintiff received well over 5,000 Oxycodone tablets during this time. (Tr. 488-93).  The report also indicates that plaintiff went to ten (10) different pharmacies for these prescriptions. (Tr. 494).

### 3.    Dr. Alan Schwarz & Consulting Physician Treatment Records

On January 24, 2007, plaintiff had an MRI of his lumbar spine, the images of which were compared to those taken on September 23, 2003. (Tr. 588-89).  The MRI concluded,

1. New small L2-3 midline disc herniation without stenosis.
2. Some progression L3-4 disc bulge.
3. Multilevel disc degeneration.
4. Bilateral L4-5 and L5-S1 foraminal narrowing due to degenerative end-plate spurring.

(Tr. 589).

On January 8, 2009, plaintiff presented with complaints of right foot pain. (Tr. 716).  Dr. Alan Schwarz notes that plaintiff is on high doses of narcotics for pain. (Tr. 716).  He prescribed plaintiff 150 tablets of Oxycodone and stressed the importance of this lasting for two weeks. (Tr. 716).  On January 28, 2009, plaintiff was again seen by Dr. Schwarz.  Plaintiff explained that he had returned to work for 3 days, and as a

28

result had increased pain, necessitating more Oxycodone. (Tr. 716). Plaintiff used 150 Oxycodone in eight days. (Tr. 716). Dr. Schwarz states, "[plaintiff] is really totally disabled from his back. Do recommend that he apply for social security disability I feel he is totally disabled." (Tr. 716).

A treatment note from February 23, 2009, indicates that plaintiff is on high doses of Oxycodone, which is not really helping plaintiff's acute low back pain. (Tr. 715). Dr. Schwarz advised plaintiff that he needed to slowly taper down on the Oxycodone. (Tr. 715). Dr. Schwarz prescribed plaintiff 150 tablets of Oxycodone on this date. (Tr. 715). On March 4, 2009, plaintiff presented to Dr. Schwarz with pains down his right leg. (Tr. 715). Plaintiff's treatment notes indicate that plaintiff took 150 Oxycodone pills over nine days. (Tr. 715). It is also noted that plaintiff uses "a lot of narcotics." (Tr. 715). Plaintiff experienced pain on palpation of his low back. (Tr. 715). Dr. Schwarz prescribed plaintiff an additional seventy-five Oxycodone tablets, with an additional seventy-five dated March 11, in the hopes that plaintiff would be able to spread out his medication better. (Tr. 715).[17] On April 17, 2009, plaintiff was seen by Dr. Schwarz and explained that as a result of moving, he is doing a lot of lifting and his experiencing a lot of pain. (Tr. 714). Plaintiff stated he would need more

---

[17] On March 9, 2009, plaintiff was seen by Prohealth Physicians in Meriden, Connecticut complaining of increased back pain after packing to vacate his residence, and that he was out of his pain medication. (Tr. 717). Dr. Maria O'Brien contacted Dr. Schwarz, who agreed to provide plaintiff with a new prescription to replace the one dated March 11. (Tr. 717).

Oxycodone for tomorrow, and requested a prescription for OxyContin, which Dr. Schwarz declined to provide.  (Tr. 714). Dr. Schwarz prescribed plaintiff seventy-five Oxycodone tablets. (Tr. 714).

On May 4, 2009, plaintiff described experiencing "a lot of knee pains" after moving all of his furniture into his new home. (Tr. 713).  Plaintiff stated his right knee was worse than his left, and requested a cortisone shot. (Tr. 713).  Dr. Schwarz gave plaintiff a cortisone shot in his right knee, and also prescribed plaintiff twenty tablets of Oxycodone. (Tr. 713).  It is noted that plaintiff is going to try to slowly taper off the oxycodone. (Tr. 713).  On May 21, 2009, Dr. Schwarz prescribed another sixty tablets of Oxycodone.  (Tr. 713).  Plaintiff's treatment notes indicate that plaintiff is supposed to find a new doctor, and that this will be his last prescription. (Tr. 713).  Five days later, plaintiff again presented to Dr. Schwarz, who again prescribed plaintiff thirty tablets of Oxycodone. (Tr. 713).

On June 1, 2009, plaintiff sought more pain medication. (Tr. 712).  It is noted that plaintiff has a history of acute lower back pain. (Tr. 712).  Dr. Schwarz prescribed seventy-five tablets of Oxycodone to plaintiff for the "last time" and noted that Windham Pain Management would be a good idea. (Tr. 712).

On August 31, 2009, plaintiff had a consultation with neurologist, Dr. Zofia Mroczka, M.D. (Tr. 760).  After

30

summarizing plaintiff's last MRI, Dr. Mroczka notes that plaintiff's "last labs were in 07 since he has no insurance now and no money to go for labs." (Tr. 760).  Plaintiff has moderate paralumbar muscle spasm. (Tr. 761).  His gait is normal. (Tr. 761).  Dr. Mroczka's impressions were hypertension and lumbar spondylosis. (Tr. 761).  She prescribed plaintiff fifty-six tablets of Oxycodone and explained that these needed to last two weeks. (Tr. 762).  She also explained that if he sought any painkillers from other doctors, that he would be kicked out of her practice. (Tr. 762).

On September 4, 2009, Dr. Schwarz saw plaintiff, who complained of low back and left knee pain.  (Tr. 712).  Dr. Schwarz administered a cortisone shot to plaintiff's left knee, and prescribed another thirty tablets of Oxycodone. (Tr. 712). In November 2009, plaintiff complained of recurring right knee pain, and received a cortisone shot. (Tr. 710).  He also had some edema in his lower legs. (Tr. 710). Plaintiff also complained of back pain and left leg pain.  Dr. Schwarz provided plaintiff with a prescription for 100 tablets of Oxycodone and advised plaintiff they needed to last one week. (Tr. 710).

An exam note from December 22, 2009 indicates that plaintiff has a history of chronic back pain, cigarette smoking, and hypertension. (Tr. 709).  Plaintiff has pain on palpation and movement of his left knee. (Tr. 709).  About a week later, plaintiff presented with left knee pain and requested a

cortisone shot, which he received. (Tr. 709).  Plaintiff's
treatment notes indicate that he is on chronic Oxycodone 30 mg,
and that plaintiff needs to see an orthopedic surgeon. (Tr.
709).

Plaintiff saw Dr. Schwarz on January 11, 2010, for a
preoperative physical. (Tr. 538).[18]  Plaintiff's history included
acute chronic low back pain, alcoholism, hypertension, cigarette
smoking, and ten 30 mg Oxycodone tablets per day. (Tr. 538).
Plaintiff weighed 315.6 pounds, and had a BMI of 42.8.
Plaintiff had pain on palpation of his low back, pain on
movement of his back, and pain in both knees. (Tr. 538).
Patient's EKG showed atrial fibrillation with fast ventricular
response. (Tr. 538).[19]  Dr. Schwarz prescribed plaintiff 100 30
mg tablets of Oxycodone. (Tr. 538).  About ten days later,
plaintiff was again seen by Dr. Schwarz for a refill of his
medications. (Tr. 538).[20]  At this time, Plaintiff was taking
Oxycodone 30 mg, 100 tablets per week. (Tr. 538).  Dr. Schwarz
gave plaintiff a prescription for 100 30 mg tablets of
Oxycodone, and advised plaintiff that the prescription needed to
last plaintiff at least a week. (Tr. 538).

---

[18] Plaintiff was scheduled for a microlaryngoscopy with biopsy due to a tongue
lesion and vocal cord polyp. (Tr. 538; 596; 759).  At the conclusion of the
preoperative physical, Dr. Schwarz concluded that surgery would be postponed.
(Tr. 538).  The record for this visit repeats at Tr. 720.

[19] As indicated in a letter to Dr. Alan Schwarz, plaintiff was seen by Dr.
Alan Spivack, M.D., of the Cardiology Associates of Central Connecticut for a
cardiology consultation as to plaintiff's atrial fibrillation. (Tr. 591-93;
754-56).  Plaintiff had a transthoracic echocardiogram on January 28, 2010.
(Tr. 594-95; 757-58).

[20] The record for this visit repeats at Tr. 720.

On March 29, 2010, Dr. Schwarz saw plaintiff for a follow up of plaintiff's seizure disorder and chronic lumbar back pain. (Tr. 539-40).[21]  Plaintiff described sharp, constant, severe pain in his left and right mid to low back that radiated into his buttocks. (Tr. 539). Plaintiff's seizure symptoms included loss of consciousness and clonus of the left arm. (Tr. 539).  His active problems were listed as alcoholism, atrial fibrillation, backache, hypertension, and COPD. (Tr. 539).  Plaintiff's social history indicates that he smokes cigarettes and is working part-time. (Tr. 539).  At this visit, plaintiff weighed approximately 301 pounds, and had a BMI of 38.69. (Tr. 540).  Dr. Schwarz diagnosed plaintiff with convulsive disorder, sleep apnea, and chronic backache. (Tr. 540).

Plaintiff was next seen by Dr. Schwarz on June 4, 2010 for a follow-up of his hypertension and chronic lumbar back pain. (Tr. 541-42).[22]  Plaintiff's hypertension was stable, and plaintiff was otherwise asymptomatic. (Tr. 541-42). Plaintiff described sharp, aching, moderate pain in his left and right lower back that is worsening. (Tr. 542). Dr. Schwarz's physical examination of plaintiff indicated that plaintiff was in moderate distress, and that he had tenderness/palpation at the left and right paraspinal levels, including bilateral muscle spasms. (Tr. 542).  Extension was restricted and painful. (Tr.

---

[21] Records for this visit repeat at Tr. 721-22.
[22] Records for this visit repeat at Tr. 723-24.

542). Dr. Schwarz "refuse[d] to increase [plaintiff's] narcotics" and recommended pain management. (Tr. 542).

Plaintiff was seen on July 29, 2010 for a follow-up oh his chronic low back pain and obesity. (Tr. 543-45).[23] At this visit, plaintiff weighed 316 pounds. (Tr. 544). Plaintiff's spinal alignment exhibited a loss of normal lordosis[24], and plaintiff experienced palpation/tenderness at the left and right paraspinal levels. (Tr. 544). Plaintiff agreed to limit his Oxycodone to fifty pills for that week. (Tr. 544). Dr. Schwarz notes that plaintiff's weight control is poor. (Tr. 545).

About a week later, on August 4, 2010, plaintiff was seen for a follow up of his chronic lumbar back pain and hypertension. (Tr. 546-48).[25] Plaintiff described sharp pain in his lower back. (Tr. 546). Plaintiff's spinal alignment exhibited a loss of normal lordosis, and plaintiff experienced palpation/tenderness at the left and right paraspinal levels. (Tr. 547). Flexion and extension were restricted and painful. (Tr. 547). Plaintiff's backache, hypertension, and atrial fibrillation are all noted as stable. (Tr. 548). Dr. Schwarz added 30 mg of morphine to plaintiff's medication, and decreased his Oxycodone. (Tr. 548).

---

[23] Records for this visit repeat at Tr. 725-27.

[24] "This so-called "flat-back syndrome" is characterized by an inability to stand erect and by upper back pain."
http://www.ncbi.nlm.nih.gov/pubmed/3282206 (last visited on February 6, 2014).

[25] Records for this visit repeat at Tr. 728-30.

Dr. Schwarz again saw plaintiff on August 9, 2010 for a follow-up of plaintiff's back pain, hypertension, smoking cessation, and obesity. (Tr.  549-51).[26] As to plaintiff's back pain, he reported doing poorly, and experiencing worsened lower extremity pain.  (Tr. 549).  Plaintiff's records for this visit note shortness of breath during exertion. (Tr. 549). Plaintiff's spinal alignment exhibited a loss of normal lordosis, and plaintiff experienced palpation/tenderness at the left and right paraspinal levels. (Tr. 549).  Flexion and extension were restricted and painful. (Tr. 549).  In assessing plaintiff's backache, Dr. Schwarz notes that the control is "poor" and increased plaintiff's morphine to 60 mg. (Tr. 551).

On August 16, 2010, plaintiff presented to Dr. Schwarz for a follow-up of his back pain and hypertension. (Tr. 552-54).[27] Plaintiff's treatment notes indicate stable lower back pain, back stiffness, buttock pain, and lower extremity pain. (Tr. 552).  At this visit, plaintiff weighed 304 pounds. (Tr. 553). Plaintiff's back symptoms are consistent with that found during the physical exam conducted the week prior. (Tr. 553). Dr. Schwarz indicates that plaintiff should try to cut down on Oxycodone. (Tr. 553).  On August 23, 2010, plaintiff presented for a follow-up of his chronic back pain and right leg pain. (Tr. 555-57).[28]  Plaintiff reported not doing well. (Tr. 555).

---

[26] Records for this visit repeat at Tr. 731-33.
[27] Records for this visit repeat at Tr. 734-36.
[28] Records for this visit repeat at Tr. 737-39.

Plaintiff's physical exam indicated that flexion and extension were restricted, but painless. (Tr. 556). Seven days later on August 30, 2010, plaintiff returned for a follow-up of his back pain. (Tr. 558-60).[29]

On September 7, 2010, plaintiff again returned to Dr. Schwarz's office for a follow-up of his back pain, and for more Oxycodone. (Tr. 561-63).[30] Three days later, on September 10, 2013, plaintiff presented on account of right leg pain. (Tr. 564-65).[31] Plaintiff's treatment records for this date note that plaintiff has been experiencing pain running down the front right leg and lower back. (Tr. 564). It is also noted that plaintiff was given a prescription for thirty Oxycodone tablets at his last visit. (Tr. 564-65). Dr. Phillips-Cole prescribed plaintiff an additional thirty tablets of Oxycodone. (Tr. 565). On September 13, 2010, plaintiff returned for another follow-up of chronic back pain. (Tr. 566-68).[32] Plaintiff reported that he "did not get" morphine, "so [he] needed more [O]xycodone." (Tr. 566). Dr. Schwarz's treatment notes indicate that he told plaintiff that "this med needs to last at least 1 week. [I]f not then he needs to find another md." (Tr. 568). On September 24, 2010, plaintiff returned to Dr. Schwarz for a follow-up of his chronic back pain. (Tr. 569-71).[33] Plaintiff reported no change

---

[29] Records for this visit repeat at Tr. 740-42.
[30] Records for this visit repeat at Tr. 743-45.
[31] Records for this visit repeat at Tr. 746-47.
[32] Records for this visit repeat at Tr. 748-50.
[33] Records for this visit repeat at Tr. 597-99 and Tr. 767-69.

in his condition. (Tr. 569). Plaintiff's pain regimen at this time still included morphine and Oxycodone. (Tr. 571).

Dr. Schwarz referred plaintiff for a neurology follow-up, which was performed by Dr. Ajay K. Shukla, M.D., on October 6, 2010. (Tr. 632-33; 802-03).[34] Plaintiff reports doing better with his seizures. (Tr. 632). Dr. Shukla notes that plaintiff has chronic, very severe obstructive sleep apnea syndrome with severe snoring disorder. (Tr. 632). He recommended plaintiff be on Auto CPAP until plaintiff has a sleep study. (Tr. 633).

On October 13, 2010, plaintiff was seen by Dr. Schwarz for a follow-up of his back pain, seizure disorder, and hypertension. (Tr. 572-74).[35] Plaintiff's hypertension and seizure disorder were both stable. (Tr. 572, 574). With respect to plaintiff's back condition, it is noted that plaintiff needs to lose weight. (Tr. 574). Plaintiff's pain regimen at this time still included morphine and Oxycodone. (Tr. 574).

On November 2, 2010, plaintiff was seen by Dr. Schwarz for back pain and a flu shot. (Tr. 575-77).[36] Plaintiff was referred to a cardiologist for evaluation and treatment of his atrial fibrillation. (Tr. 577). Plaintiff returned to Dr. Schwarz's office on November 17, 2010 for back pain and narcotic

---

[34] Plaintiff also saw Dr. Shukla on May 26, 2010 and August 12, 2010. (Tr. 763-66). Plaintiff reported doing well with seizure medication. (Tr. 765). It is also noted that plaintiff has clinically evident moderately severe sleep disordered breathing. (Tr. 766).

[35] Records for this visit repeat at Tr. 600-02 and Tr. 770-72.

[36] Records for this visit repeat at Tr. 603-05 and Tr. 773-75.

37

medication. (Tr. 578-80).[37] Plaintiff's treatment notes state, "Last week called in for oxycodone for back pain and script wasn't filled. (Records show that it was) Has had pain since 1993. Long term patient with Dr. Schwarz. Has been tapering down with Dr. Schwarz's help from narcotics. Has signed a pain mgmt. agreement; [h]ad drug testing in July 2010 that was negative." (Tr. 578; 752). Plaintiff's physical exam indicates "LROM due to pain." (Tr. 579). Five days later on November 22, 2010, plaintiff returned to Dr. Schwarz with complaints that morphine did not help his pain. (Tr. 581-84).[38] Plaintiff's backache control is noted as poor. (Tr. 583). Plaintiff's Oxycodone was increased to sixty per week, and his morphine was discontinued. (Tr. 583). Plaintiff's atrial fibrillation, COPD, convulsive disorder, and hypertension are stable. (Tr. 583).

On December 10, 2010, plaintiff presented with increased pain in his legs. (Tr. 585-87).[39] Plaintiff described worsened lower back and lower extremity pain. (Tr. 585). Dr. Schwarz provided plaintiff with an extra twenty oxycodone tablets. (Tr. 587). Plaintiff returned to Dr. Schwarz on December 20, 2010 with "a lot" of back and leg pain. (Tr. 616-18).[40] Plaintiff's treatment notes state that plaintiff used 120 30 mg Oxycodone tablets in one week. (Tr. 616). Plaintiff's spinal alignment still exhibited decreased lordosis. (Tr. 617). Plaintiff also

---

[37] Records for this visit repeat at Tr. 606-08 and Tr. 776-78.
[38] Records for this visit repeat at Tr. 609-12 and Tr. 779-82.
[39] Records for this visit repeat at Tr. 613-15 and Tr. 783-85.
[40] Records for this visit repeat at Tr. 786-88.

still had painful extension, flexion, and rotation. (Tr. 617).
Plaintiff was referred to pain management for evaluation and
treatment. (Tr. 617-18).

On January 20, 2011, plaintiff was seen by Dr. Schwarz for
back pain and bilateral leg pain. (Tr. 623-25).[41] Plaintiff's
treatment notes indicate that plaintiff "already finished pain
meds." (Tr. 623). Plaintiff had worsened lower back pain, back
stiffness, buttock pain, and lower extremity pain. (Tr. 623).
Plaintiff experienced tenderness at level L2-L5 left and right
paraspinal levels. (Tr. 625). Plaintiff also had bilateral
muscle spasms. (Tr. 625). Flexion, extension, and rotation were
all restricted and painful. (Tr. 625). Plaintiff was referred
for pain management. (Tr. 625).

On February 4, 2011, plaintiff was seen by Dr. Schwarz, who
advised plaintiff to, "Continue to follow along with co-managing
specialist pain management." (Tr. 626-28).[42] On February 25,
2011, plaintiff presented with nasal congestion and noted that
he is going to pain management. (Tr. 629-31).[43] Plaintiff
reported no change in his back condition. (Tr. 629).

Records from MidState Medical Center dated March 6, 2011
indicate that plaintiff was seen for chronic pain and pain
management. (Tr. 751). Plaintiff was instructed to take 5 mg of
Valium, 1 tablet, two to three times per day; 1 tablet of

---

[41] Records for this visit repeat at Tr. 793-95.
[42] Records for this visit repeat at Tr. 796-98.
[43] Records for this visit repeat at Tr. 799-801.

Vicodin every six hours; and a Medrol dose pack, as directed. (Tr. 751).

### 4.   Dr. Schwarz Multiple Impairment Questionnaire (Tr. 809-16)

Dr. Schwarz completed a Multiple Impairment Questionnaire ("MIQ") dated March 22, 2011. (Tr. 809-16).  Dr. Schwarz's diagnosis of plaintiff includes chronic low back pain, COPD, and hypertension. (Tr. 809).  Plaintiff receives a poor prognosis for his chronic low back pain and obesity, but a stable prognosis for his COPD, hypertension and seizure condition. (Tr. 809).  Plaintiff's low back pain is "even to the point of inability to do some ADLs." (Tr. 809).  Dr. Schwartz indicates that plaintiff's symptoms and functional limitations are reasonably consistent with plaintiff's physical impairments described in the MIQ. (Tr. 810) Plaintiff has constant, chronic sharp pain in his low back into his legs that is made worse with movement. (Tr. 810-11).  Plaintiff also has pain without movement. (Tr. 811).  Dr. Schwarz rates plaintiff's pain as a 9 on a scale of 0 to 10, and plaintiff's fatigue as a 6 on a scale of 0-10. (Tr. 811).

As a result of plaintiff's impairments, Dr. Schwarz ascribes the following RFC to plaintiff: can sit 0-1 hours in an 8 hour workday; can stand/walk 0-1 hours in an 8 hour workday; plaintiff cannot sit or stand/walk continuously in a work setting and must move around every 30 minutes; plaintiff can occasionally lift and carry 0-5 pounds, but can never lift or

carry anything heavier. (Tr. 811-12). Plaintiff also has
significant limitations doing repetitive reaching, handling,
fingering or lifting as a result of plaintiff's chronic pain.
(Tr. 812). Plaintiff has moderate limitations grasping,
turning, and twisting objects; minimal limitations using his
hands for fine manipulations; and moderate limitations using his
arms for reaching. (Tr. 812-13). Dr. Schwarz indicates that
plaintiff's symptoms are likely to increase if he is placed in a
competitive work environment. (Tr. 813). Plaintiff's condition
also interferes with his ability to keep his neck in a constant
position. (Tr. 813). Plaintiff's pain, fatigue or other
symptoms are severe enough to interfere with plaintiff's
attention and concentration on a constant basis. (Tr. 814).
During an eight hour work day, plaintiff would need to take ten
minute breaks every thirty minutes. (Tr. 814). Dr. Schwarz
also estimated that plaintiff would be absent from work more
than three times per month as a result of his impairments, and
identifies the following limitations for plaintiff: need to
avoid fumes and gases; and no pushing, pulling, kneeling,
bending, or stooping. (Tr. 815).

Dr. Schwarz also submitted a statement dated October 14,
2011, which states that plaintiff is his patient and

> in [Dr. Schwarz's] best medical opinion is totally
> disabled without consideration of any past or present
> drug and/or alcohol use. Drug and/or alcohol use is
> not a material cause of [plaintiff's] disability. In
> [his] best medical opinion the use is not material
> because: [plaintiff's] use of drugs and/or alcohol is
> a symptom of his condition. And/or is a form of self-

medication. The disability is independent of any use. (Tr. 831).

### 5. Connecticut Spine and Sports Records

Plaintiff was first seen by Connecticut Spine and Sports Physicians on March 7, 2007 for a consultative examination. (Tr. 817-820). Plaintiff's past history of lower back pain, degenerative changes, and lumbar fusion is noted. (Tr. 817). Plaintiff's current condition includes significant pain across his lower back with burning discomfort over the midscapular region, and pain in the right lower extremity to the medial thigh and leg. Plaintiff experiences disrupted sleep due to back pain and anxiety from not working.[44] (Tr. 817). Plaintiff also has a history of intermittent neck pain, with no pain, numbness or weakness in the upper extremities. (Tr. 817). Electric stimulation, cortisone injections, and epidural injections helped with plaintiff's pain. (Tr. 818). Plaintiff's sitting tolerance is one to two hours, standing one half to one hour, and walking one half to one mile. (Tr. 818). At this time, plaintiff was taking OxyContin 160 mg, and Percocet 10 mg. (Tr. 818). Plaintiff's lumbar flexion was to about fifty degrees with no significant pain; extension was less than five degrees with increased back pain, particularly on the right side. (Tr. 818). Side bending to the right side was limited and caused plaintiff right lower back pain. (Tr. 818). Plaintiff had

---

[44] Plaintiff's treatment records indicate that he was laid off in November 2006.

tenderness over the left mid periscapular muscles. (Tr. 819).
After noting the results of plaintiff's MRI, the treating
physician notes that plaintiff may have a significant degree of
facet joint mediated pain contributing to his discomfort in the
right lower back.   (Tr. 819).  Plaintiff also has cervical
spondylosis with stenosis. (Tr. 819).  It was recommended that
plaintiff receive right lumbar fact joint injections for
diagnostic and therapeutic purposes. (Tr. 819).

On February 10, 2011, plaintiff presented for a
consultation of low back pain. (Tr. 634-36).[45]  Plaintiff
explained that his pain began in 1991 following a work accident.
(Tr. 634).  Between 1991 and 1999, plaintiff experienced
worsened radicular symptoms and had an anterior fusion, after
which he continued to work until 2009. (Tr. 634).  Plaintiff
reports worsening pain with sitting, twisting, shoveling, and
lifting anything heavy. (Tr. 634).  Plaintiff feels better
resting and standing. (Tr. 634). Plaintiff's pain radiates to
his lateral hip, across thigh and anterior shin, and down his
legs.  (Tr. 634).  Plaintiff reports previous treatments of
epidural injections, physical therapy and pain medication. (Tr.
634). Plaintiff's physical examination showed decreased cervical
and lumbar lordosis, and range of motion decreased in all
directions to approximately ten degrees. (Tr. 635).  Straight
leg raises were negative, but plaintiff experienced tenderness
to palpation at the lumbar paraspinals. (Tr. 635).  Plaintiff

---

[45] Records for this visit repeat at Tr. 804-06 and Tr. 821-23.

was assessed with Intervertebral Disc Displacement Lumbar without Myelopathy. (Tr. 635-36). The attending physician notes that plaintiff has back pain due to a number of factors, including disc degeneration and facet hytropathy. (Tr. 635). Plaintiff's body habitus and description suggest compressed lateral femoral cutaneous nerves. (Tr. 635).  It is also noted that plaintiff's obesity and smoking contribute to the severity of his pain. (Tr. 635).  The doctor recommended starting plaintiff on Cymbalta, and OxyContin in light of plaintiff taking such a large dose of immediate acting Oxycodone. (Tr. 635). Plaintiff was also assessed with lumbago, and neuritis or radiculitis thoracic or lumbosacral unspec (sic). (Tr. 636).

Plaintiff was next seen on February 28, 2011 for a follow up of his low back pain. (Tr. 637-38).[46] Plaintiff reported that his condition had not changed, and that the OxyContin "worked for him." (Tr. 637).  Plaintiff also stated that he was taking two tablets of 30 mg Oxycodone every three to four hours. (Tr. 637). Plaintiff reported receiving a back brace and that it seems to help. (Tr. 637).  Plaintiff reported arthritis, stiffness and swelling. (Tr. 637). Plaintiff also reported anxiety, claustrophobia, depression, and sleep pattern disturbance. (Tr. 637).  Plaintiff's treatment notes indicate that the attending physician had a long discussion with plaintiff about his pain medication, and that long term goal is

---

[46] Records for this visit repeat at Tr. 807-08 and Tr. 824-25.

to reduce his dependence on opioids for pain management. (Tr. 638).

On March 10, 2011, plaintiff had bilateral L3-4 transforaminal epidural injections administered. (Tr. 830). He tolerated the procedure well, and there were no complications. (Tr. 830).

On March 21, 2011, plaintiff was seen for a follow-up of his back pain. (Tr. 826-27). Plaintiff described having spasms down both his legs for the past four to five days. (Tr. 826). Plaintiff's treatment records note that he had been given two week refills of Oxycodone and OxyContin, both of which plaintiff needed refilled. (Tr. 826). Plaintiff stated that he would like to discuss muscle relaxants at his next visit. (Tr. 826). Plaintiff was assessed with Lumbago, Intervertebral Disc Displacement Lumbar without Myelopathy, and Neuritis or Radiculitis Thoracic or Lumbosacral Unspec. (Tr. 827). It is further noted that plaintiff is exhibiting signs of medication dependence and that he "has been demanding oxycodone." (Tr. 827). It is also noted that an MRI will be done, as his last was done in 2007. (Tr. 827).

On April 7, 2011, plaintiff was seen for another follow-up. (Tr. 828-29). Plaintiff's treatment notes reference a long conversation about opioid medications, and a concern for the dosage plaintiff needs to function. (Tr. 828-29). The treating physician suggested plaintiff participate in a tapering schedule

to stop the medications, and that a pain management doctor would be better to manage plaintiff's care. (tr. 829).

### 6.   Dr. Loretta J. Pilagin Medical Records (Tr. 833-74)

A letter dated August 31, 2012, states that plaintiff sees Dr. Pilagin monthly for pain management. (Tr. 833).  In addition to the diagnoses of lumbar degenerative disc disease, atrial fibrillation, and epilepsy, Dr. Pilagin also diagnosed plaintiff with coronary artery disease, hypertension cardiomyopathy, and COPD upon examination and review of his old records and stress test. (Tr. 833).  Dr. Pilagin states that plaintiff is expected to gradually get worse over time, he will never be able to work full time, and never in his prior field.  (Tr. 833).  Any part time work will be significantly limited by his chronic pain, mobility limitations and medication side effects. (Tr. 833).

At one point during his treatment with Dr. Pilagin, plaintiff thought he could lower his Oxycodone dose "a little." (Tr. 589).  Notwithstanding the foregoing, less than two months later, plaintiff prematurely ran out of his medication as a result of taking more for increased pain. (Tr. 855).  Although Dr. Pilagin refilled plaintiff's Oxycodone prescription, she warned him that she would no longer treat him if this happened again. (Tr. 856).  Plaintiff had a stress test dated February 10, 2012, which showed decreased wall motion septurn, ejection fraction 33%, and possible decreased inferior wall activity. (Tr. 867).

46

Included among Dr. Pilagin's treatment records is an MRI of plaintiff's lumbar spine dated October 10, 2011. (Tr. 871-72). The MRI found mild to moderate disc degenerative changes, with only mild neural foraminal narrowing at multiple levels. (Tr. 872).  At L1-2, plaintiff has a moderate sized disc bulge, with a superimposed posterior central moderate sized disc protrusion. (Tr. 871).  At L2-3, there is a posterior central annular tear, along with a small disc bulge. (Tr. 871).  At L3-4 there is a small broad-based disc bulge. (Tr. 871). At L4-5 there is up to moderate sized disc bulge, along with an annular tear, and moderate facet degenerative change with hypertrophy.  (Tr. 871).

Dr. Pilagin also completed an MIQ dated August 27, 2012. (Tr. 834-42).  She had treated plaintiff since January 24, 2012. (Tr. 834).  She diagnosed plaintiff with lumbar degenerative disc disease; spinal fusion with radicular pain; atrial fibrillation; seizure disorder; and COPD. (Tr. 834).[47]  Plaintiff has a progressive disease with chronic symptoms, including pain and difficulty with mobility. (Tr. 834-35). Dr. Pilagin indicates that plaintiff's symptoms and functional limitations are reasonably consistent with plaintiff's physical impairments described in the MIQ. (Tr. 835) Plaintiff has dull ache in his lower back with throbbing and stabbing sixty five percent of the day. (Tr. 835-36).  Dr. Pilagin rates plaintiff's pain as a 6-10

---

[47] Dr. Pilagin supports her diagnoses with, inter alia, the MRI dated 10/10/11, patient history, and various EKG and stress test results. (Tr. 834).

on a scale of 0 to 10, and plaintiff's fatigue as a 7 on a scale of 0-10. (Tr. 836).

As a result of plaintiff's impairments, Dr. Pilagin ascribes the following RFC to plaintiff: can sit 3 hours (with breaks) in an 8 hour workday; can stand/walk 3 hours (with breaks) in an 8 hour workday; plaintiff cannot sit or stand/walk continuously in a work setting and must move around every 30 minutes; plaintiff can occasionally lift and carry 0-10 pounds, but can never lift or carry anything heavier. (Tr. 836-37). Plaintiff does not have significant limitations doing repetitive reaching, handling, fingering or lifting. (Tr. 837).  Dr. Pilagin indicates that plaintiff's symptoms are likely to increase if he is placed in a competitive work environment. (Tr. 838).  Plaintiff's condition does not interfere with his ability to keep his neck in a constant position. (Tr. 838). Plaintiff's pain, fatigue or other symptoms would seldom interfere with plaintiff's attention and concentration. (Tr. 839). During an eight hour work day, plaintiff would need to take 15 minute breaks every hour.  (Tr. 839).  Dr. Pilagin also ascribes the following limitations to plaintiff: need to avoid heights; and no pushing, pulling, kneeling, bending, or stooping. (Tr. 840).

### 7.   State of Connecticut Seizure Questionnaire (Tr. 235-36)

A State of Connecticut Seizure Questionnaire dated December 13, 2010, indicates that plaintiff had one seizure where he

blacked out and was taken by ambulance to Windham Hospital. (Tr. 235-36).  Plaintiff states that he has not had any seizures since he was placed on Levetiracetam. (Tr. 235-36).

### 8.   Disability Reports (Tr. 208-15, 237-59)

An undated Disability Report indicates plaintiff is unable to work due to degenerative disc disease, seizures, and hypertension, all of which cause pain or other symptoms. (Tr. 209).  Plaintiff is six feet tall, and weighs 300 pounds. (Tr. 209). Plaintiff stopped working on October 31, 2008 as a result of being laid off due to a lack of work. (Tr. 209).  Plaintiff lists a job history of car restorer, glass production/installation, and welder. (Tr. 210).  Plaintiff reports taking the following medications: Cepra, for seizures; Cumadin, a blood thinner; Lasix; Morphine Sulfate, for pain; and Oxycodone, 30 mg, for pain. (Tr. 212).  Plaintiff's primary care physician is Dr. Allen Schwarz. (Tr. 212).  Plaintiff has also been seen by Windham Community Memorial Hospital for back pain, seizures, and a sleep study. (Tr. 213).  Plaintiff reports having back surgery in 1999 at Yale New Haven Hospital. (Tr. 213).

An undated Appeal Disability report indicates no change in plaintiff's condition since the last disability report dated November 4, 2010. (Tr. 239).  Plaintiff reports that since the last disability report, the Connecticut Spine and Sports physician treated him for degenerative disc disease, severe back

pain, and lumbar and cervical spine impairment. (Tr. 240).
Plaintiff received a cortisone injection in his lower back. (Tr.
240).  Plaintiff also was seen by Dr. Schwarz for degenerative
disc disease, severe back pain, lumbar and cervical spine
impairment, high blood pressure, cardiovascular disorder, and
seizures. (Tr. 240).  Plaintiff reports being treated by Windham
Community Memorial Hospital on August 5, 2010 for seizures. (Tr.
241).  At the time of this report, plaintiff was taking the
following medications: Furosemide, a water pill; Oxycodone, 30
mg, for pain; Quinapril, for high blood pressure; and Warfarin,
a blood thinner. (Tr. 241).  Plaintiff reports no changes in his
activities of daily living. (Tr. 242). A second undated Appeal
Disability Report indicates no change in plaintiff's condition
since he last completed a disability report on March 10, 2011.
(Tr. 247).

An Appeal Disability Report dated June 10, 2011, indicates
no change in plaintiff's condition since he last completed a
disability report. (Tr. 252).  Plaintiff also reports no change
in his limitations, or any new illnesses, injuries or
conditions. (TR. 252-53).  Since his last disability report,
plaintiff saw Dr. Schwarz for degenerative disc disease, severe
back pain, lumbar and cervical spine impairment, high blood
pressure, cardiovascular disorder, and seizures. (Tr. 253).  He
was also seen by the Connecticut Spine and Sports physicians for
treatment of degenerative disc disease, severe back pain, and

50

lumbar and cervical spine impairment. (Tr. 254). At the time of
this report, plaintiff was taking the following medications:
Furosemide, a water pill; Oxycodone, 30 mg, for pain; Quinapril,
40 mg, for high blood pressure; and Warfarin, a blood thinner.
(Tr. 255).  Plaintiff reports no changes in his activities of
daily living. (Tr. 257).

### 9. Dr. Khurshid Khan Disability Determination Explanation (initial level) dated January 20, 2011 (Tr. 72-89)[48]

After reviewing medical records, Dr. Khan concluded that
plaintiff suffers from several medically determinable
impairments, including disorders of the back – discogenic and
degenerative, and epilepsy. (Tr. 75, 84).  In his physical RFC
assessment, Dr. Khan concluded that plaintiff had the following
exertional limitations: could occasionally lift 20 pounds;
frequently lift 10 pounds; stand, walk and sit for a total of 6
hours in an 8 hour workday; and push and pull unlimited, other
than the limitations shown for lifting. (Tr. 76, 85).  Dr. Khan
also identified the following postural limitations: plaintiff
could occasionally climb ladders, ropes or scaffolds, stoop,
kneel, crouch, and crawl; could frequently balance, and climb
ramps or stairs. (Tr. 76-77, 85-86).  No manipulative, visual,
or communicative limitations were identified. (Tr. 77, 86).  Dr.
Khan found that plaintiff should avoid concentrated exposure to
vibration, fumes, odors, dusts, gases and poor ventilation, and

---

[48] The Disability Determination Explanations for plaintiff's DIB claim
(Tr. 72-80), and DI claim (Tr. 81-89), are identical.

hazards. (Tr. 77, 86).   After an assessment of plaintiff's
vocational factors, it was determined that plaintiff did not
have the RFC to return to his past relevant work as it is
actually performed, or as it is generally performed in the
national economy. (Tr. 78, 87).  It was also determined that
plaintiff had the physical RFC to perform light work, including
that of a crossing guard, gluer, and marker.  (Tr. 79, 88).
Ultimately, plaintiff was found not disabled. (Tr. 79-80, 88-
89).

> **10.  Dr. Firooz Golkar Disability Determination
> Explanation (Reconsideration) dated April 21, 2011
> (Tr. 92-111)[49]**

On reconsideration, Dr. Golkar considered new evidence from
Windham Community Memorial Hospital, Dr. Schwarz, and an
"unknown name." (Tr. 93-94, 108-104).  After reviewing medical
records on reconsideration, Dr. Golkar concluded that plaintiff
suffers from the severe medical impairments of disorders of the
back, discogenic and degenerative, and obesity. (Tr. 96, 106).
Dr. Golkar also found that plaintiff suffers from the non-severe
impairments of epilepsy and hypertension. (Tr. 97, 107). Dr.
Golkar concluded that plaintiff's statements about intensity,
persistence, and functionally limiting effects of plaintiff's
symptoms were not substantiated by the medical evidence alone,
and found plaintiff only partially credible. (Tr. 97, 107).  In
his physical RFC assessment, Dr. Golkar concluded that plaintiff

---

[49] The Disability Determination Explanations - Reconsideration for plaintiff's
DIB claim (Tr. 92-101), and DI claim (Tr. 102-111), are identical.

had the same exertional and postural limitations as found by Dr.
Khan, except that plaintiff should only avoid concentrated
exposure to hazards. (Tr. 97-99, 107-109).  After an assessment
of plaintiff's vocational factors, Dr. Golkar determined that
plaintiff did not have the RFC to return to his past relevant
work as it is actually performed, or as it is generally
performed in the national economy. (Tr. 99-100, 109-10).  He
also determined that plaintiff had the physical RFC to perform
light work, including that of a crossing guard, gluer, and
marker.  (Tr. 100-01, 110-11).   Ultimately, plaintiff was again
found not disabled. (Tr. 101, 111).

### 11.  Representative Briefs dated November 8, 2011 & February 10, 2011 (Tr. 264-72)

Plaintiff's representative submitted a letter brief to the
ALJ prior to the administrative hearing.  (Tr. 264-67).
Plaintiff's representative claimed that plaintiff is unable to
perform his past relevant work as a glazier due to chronic low
back pain, clonus of the left arm, seizure disorder, severe
sleep apnea, hypertension, morbid obesity, chronic obstructive
pulmonary disorder ("COPD"), and depression secondary to chronic
pain. (Tr. 264). After summarizing the relevant medical
evidence, plaintiff's representative asserts that plaintiff is
unable to perform even sedentary work. (Tr. 267).

Plaintiff's representative also submitted a letter brief
dated February 10, 2011 to the Appeals Council, claiming the ALJ
failed to apply the treating physician rule, find all of

plaintiff's impairments "severe", properly assess plaintiff's
RFC, and conduct a proper credibility analysis. (Tr. 268-72).

## V.   DISCUSSION

Plaintiff makes a number of arguments in support of
reversal and/or remand of the Commissioner's final decision
denying disability. For the reasons that follow, the Court
GRANTS in part and DENIES in part plaintiff's Motion for
Judgment on the pleadings and DENIES defendant's Motion to
Affirm

### 1.   Treating Physician Rule

Plaintiff first argues that the ALJ failed to follow the
treating physician rule. Specifically, plaintiff argues that the
ALJ failed to give appropriate reasons for assigning limited
weight to Dr. Schwarz's opinions, and also erred by crediting
the opinions of the non-examining state agency medical
consultants.

#### a)   Weight accorded to Dr. Schwarz's Opinion

Under the treating physician rule, the SSA gives deference
to the views of the physician who has engaged in the primary
treatment of a claimant. See Burgess v. Astrue, 537 F.3d 117,
128 (2d Cir. 2008); 20 C.F.R. § 404.1527(d)(2). The treating
physician rule requires that the views and medical opinions of
the treating physician be given controlling weight, provided
that they are supported by objective medical evidence and "not
inconsistent with other substantial evidence in the case

record." Id. "The regulations further provide that even if controlling weight is not given to the opinions of the treating physician, the ALJ may still assign some weight to those views, and must specifically explain the weight that is actually given to the opinion." Shrack v. Astrue, 608 F. Supp. 2d 297, 301 (D. Conn. 2009) (citing Schupp v. Barnhart, No. Civ. 3:02CV103, 2004 WL 1660579, at *9 (D. Conn. March 12, 2004)). "Courts have consistently held that the '[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is ground for remand.'" Shrack, 608 F. Supp. 2d, at 301 (quoting Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)). If the treating physician's opinion is not supported by objective medical evidence or is inconsistent with other substantial evidence in the record, the ALJ need not give the opinion significant weight. See Poupore v. Astrue, 566 F.3d 303, 307 (2d Cir. 2009).

The parties dispute the applicability of language used in a recent Second Circuit decision discussing the treating physician rule. In Selian v. Astrue, the Second Circuit states that, "In order to override the opinion of the treating physician, we have held that the ALJ must explicitly consider, inter alia: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." 708 F.3d 409,

418 (2d Cir. 2013) (citing <u>Burgess</u>, 537 F.3d at 128) (emphasis
added).  Defendant contends that despite this language,
"explicit" consideration of all mentioned factors is not
required because (1) the holding of <u>Halloran v. Barnhart</u>, 362
F.3d 28, 31-33 (2d Cir. 2004), that it is sufficient when a
court can discern from the context that an ALJ has applied the
substance of the treating physician rule, is still binding
precedent; and (2) <u>Selian</u> did not announce a new rule, but
rather repeated what the Second Circuit had previously held.
[Doc. #12-1, at 4].  Plaintiff in turn submits that an ALJ "must
give detailed consideration to the factors and set forth
explicit reasons under the factors of the weight assigned to
treating sources even if they are not considered in a
formulistic fashion" [Doc. #13, at 3].  The Court disagrees that
the ALJ must <u>explicitly</u> review each factor described by 20
C.F.R. §404.1527(c).  Indeed, a similar argument was rejected by
the Second Circuit in a summary order issued on the same day as
<u>Selian</u>.[50]  In <u>Atwater v. Astrue</u>, the Second Circuit rejected the
plaintiff's argument that the ALJ failed to explicitly review
each factor provided for in 20 C.F.R. §404.1527(c), and noted,
"We require no such slavish recitation of each and every factor
where the ALJ's reasoning and adherence to the regulation are
clear."  512 F. App'x at 70 (<u>citing</u> <u>See</u> <u>Halloran</u>, 362 F.3d at
31-32 (per curiam) (affirming ALJ opinion which did "not

---

[50] The decision, <u>Atwater v. Astrue</u>, 512 F. App'x 67 (2d Cir. 2013), was not
only issued on the same day as <u>Selian</u>, February 21, 2013, but Circuit Judge
Katzmann sat on both panels.

expressly acknowledge the treating physician rule," but where "the substance of the treating physician rule was not traversed.")); see also Khan v. Astrue, No. 11-CV-5118(MKB), 2013 WL 3938242, at *15 (E.D.N.Y. July 30, 2013) (internal citation omitted) ("The regulations require that the ALJ set forth the reasons for the weight he or she assigns to the treating physician's opinion.  The ALJ is not required to explicitly discuss the factors, but it must be clear from the decision that the proper analysis was undertaken.").  Therefore, the ALJ is not required to explicitly review each factor ascribed by 20 C.F.R. §404.1527(c), so long as it is apparent from the ALJ's decision that the substance of the treating physician rule was properly applied.

Here, the ALJ indicated that he gave little weight to Dr. Schwarz's March 2011 MIQ because it is inconsistent with the weight of the objective medical evidence, the plaintiff's treatment history, and the plaintiff's testimony concerning his activities of daily living. (Tr. 32-33).  As detailed further above, Dr. Schwarz opined, inter alia, that plaintiff is limited to sitting and standing/walking for up to one hour during an eight hour work day; must move around every thirty minutes; can occasionally lift and carry up to five pounds, but never more; has moderate limitations grasping, turning, twisting, and using arms for reaching, but only minimal limitations using his fingers and hands for fine manipulation; requires unscheduled

breaks every thirty minutes; and cannot push, pull, kneel, bend or stoop. (Tr. 811-15).

Under the "treating physician rule," a treating physician's opinion on the nature and severity of a claimant's condition is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record." 20 C.F.R. § 404.1527(d)(2). Here, the Court finds that the ALJ did not err in failing to assign controlling weight to Dr. Schwarz's opinion because it is not supported by the objective medical evidence and is inconsistent with other medical evidence of record, including other clinical examinations. For example, during plaintiff's frequent visits to the Windham Community Memorial Hospital Emergency Department, plaintiff often reported his pain as moderate (Tr. 337, 342, 400 439, 453). On April 18, 2010, plaintiff reported mild pain, and on a scale of zero to ten, reported his pain level as a "0 – No Pain." (Tr. 376, 281). Plaintiff's physical examination at these visits often showed a normal gait and/or back flexion to ninety degrees. (Tr. 299, 311, 325, 329, 388, 404, 448, 456, 480, 484). It is further noted on several occasions that although plaintiff complained of moderate to severe back pain, he was able to ambulate to the exam room and did not appear in distress. (Tr. 442, 472, 484). Plaintiff exhibited tenderness of his lumbar spine (Tr. 337) and decreased range of motion (Tr.

58

400, 427, 439), but he also at exhibited "slight pain to palp"
(Tr. 325) and minimal lumbar paraspinous tenderness (Tr. 456).
Although a bilateral leg lift to thirty degrees caused plaintiff
pain (Tr. 325), plaintiff later had several negative straight
leg tests. (Tr. 439, 480). Moreover, the MRIs cited by
plaintiff do not lend support to his argument that Dr. Schwarz's
opinion is entitled to controlling weight. One of the MRIs
referenced in the March 7, 2007 medical record is from December
7, 2005, when plaintiff was still working. (Tr. 817-819).
Accordingly, because plaintiff was able to work despite the
condition reflected on his MRI results, this does not support
the limitations assigned by Dr. Schwarz. The other MRI
referenced, although not dated, "showed new small midline disc
herniation at L2-3 and bulging at L3-4 with degenerative
changes. There was facet hypertrophy at L4-5 and some narrowing
at the L4-5 foramen as well as L5-S1 foramen due to degenerative
endplate spurring." (Tr. 819). This undated MRI appears to
summarize the January 24, 2007 MRI, reflected in the record at
Tr. 588-89. This MRI also fails to support Dr. Schwarz's
opinions in light of the plaintiff's testimony that he last
worked in 2008; if accurate he was able to work with the
conditions reflected in the January 24, 2007 MRI. Dr. Schwarz's
prescribed limitations are also not entirely supported by the
October 10, 2011 MRI, which only shows mild to moderate
degenerative changes, mild to moderate narrowing of the thecal

sac, no to minimal neural foraminal narrowing. (Tr. 871).

However, when a treating physician's opinion is not given controlling weight, the opinion is still entitled to some weight because a treating physician "[is] likely to be the medical professional[ ] most able to provide a detailed, longitudinal picture of [the plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. §404.1527(d)(2).  As previously discussed, when the treating physician's opinion is not given controlling weight, the ALJ must assess what weight to give the opinion by using various factors, including: (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." Selian, 708 F.3d at 418.  After considering these factors, the ALJ must "give good reasons" for the weight he afforded to the treating source's opinion. Burgess, 537 F.3d at 129 (quotation marks and citation omitted). "Failure to provide such 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." Id. at 129–30 (quoting Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999)).

Plaintiff argues that the ALJ failed to give appropriate reasons for giving little weight to Dr. Schwarz's opinions. Defendant, on the other hand, submits that the ALJ explained that he gave little weight to this opinion because it was inconsistent with the weight of the evidence, Plaintiff's treatment history, and Plaintiff's own characterization of his daily activities. [Doc. #12-1, at 5].  Although the ALJ need not explicitly consider the factors laid out in <u>Selian</u>, it must be clear from the ALJ's decision that a proper analysis was undertaken.  The Court is not convinced that this was the case here.  Indeed, of the factors listed by <u>Selian</u>, it appears that the ALJ only considered two: that Dr. Schwarz is not a specialist, and that his opinion is not consistent with the remaining medical evidence.  Although the ALJ noted that plaintiff has a "significant history" with Dr. Schwarz, it is not apparent that the ALJ considered the "the frequency, length, nature, and extent of treatment."  Indeed, in his eleven (11) page decision, the ALJ reduces Dr. Schwarz's treatment of plaintiff to one paragraph.[51] (Tr. 31). Moreover, the ALJ fails to acknowledge that over roughly two years, Dr. Schwarz saw plaintiff nearly thirty (30) times, mostly for complaints of back pain. Dr. Schwarz's MIQ also indicates that he first treated plaintiff more than fifteen years ago. (Tr. 809).  This is also not referenced in the ALJ's decision.  Had the ALJ

---

[51] A second paragraph also discusses Dr. Schwarz's treatment of plaintiff, but only in the context of plaintiff's alleged "drug seeking behavior." (Tr. 32).

considered the frequency, length, and nature of Dr. Schwarz's treatment, the ALJ might have given his opinion more weight. Moreover, it is not apparent from the ALJ's decision that he considered the medical evidence of record that lends some support to Dr. Schwarz's opinion.  For example, the ALJ fails to acknowledge the medical records from Connecticut Spine and Sports that note, for example, that plaintiff "may have a significant degree of facet joint mediated pain contributing to his discomfort in his low back" (Tr. 819); "has cervical spondylosis with stenosis" (Tr. 819); has decreased cervical and lumbar lordosis (Tr. 635); has intervertebral disc displacement lumbar without myelopathy (Tr. 635-36, 827); and whose "body habitus and description suggest compressed lateral femoral cutaneous nerves." (Tr. 635).  If the ALJ had considered this evidence, he might have given Dr. Schwarz's opinion more weight. Finally, to the extent that ALJ ascribed limited weight to Dr. Schwarz's opinion because it is "inconsistent with [plaintiff's] treatment history", (Tr. 33), "the opinion of the treating physician [is not] to be discounted merely because he has recommended a conservative treatment." Burgess, 537 F. 3d at 129.  Because it is not clear that the ALJ considered all of the factors enumerated in the regulations, the ALJ failed to give "good reasons" for according Dr. Schwarz's opinion little weight, and this constitutes an independent reason to remand the case to make sure all of the factors were given appropriate

consideration.

### b)   Weight ascribed to non-examining medical consultants

By contrast, the ALJ ascribed great weight to the opinion of the non-examining state agency medical consultant Dr. Firooz Golkar, who opined that plaintiff "could perform the requirements of light work with frequent climbing of ramps and stairs, frequent balancing, and occasional climbing of ladders, ropes or scaffolds, stooping, kneeling, crouching, and crawling, while avoiding concentrated exposure to workplace hazards." (Tr. 33).  The ALJ found Dr. Golkar's opinion consistent with the weight of the objective medical evidence, the plaintiff's treatment history, and plaintiff's testimony concerning his activities of daily living.  (Tr. 33).  The ALJ also accorded significant weight to non-examining state agency medical consultant Dr. Khurshid Khan, who opined that plaintiff "could perform the requirements of light work while frequently balancing and climbing ramps and stairs, and occasionally climbing of ladders, ropes or scaffolds, stooping, kneeling, crouching, and crawling, while avoiding concentrated exposure to hazards, pulmonary irritants, and vibrations." (Tr. 33).  The ALJ did not find that the weight of the objective medical evidence supported the limitation with regard to concentrated exposure to vibrations or pulmonary irritants. (Tr. 33).

"'State agency medical and psychological consultants ... are highly qualified psychologists who are experts in Social

Security disability evaluation,' 20 C.F.R. § 404.1527(f), and, as the Second Circuit has held, the opinions of non-examining sources can override the treating sources' opinions provided they are supported by evidence in the record." Mitchell v. Astrue, 3:10 CV 902 CSH, 2011 WL 9557276, at *15 n. 22 (D. Conn. May 24, 2011) report and recommendation adopted, 3:10-CV-00902 CSH, 2012 WL 6155797 (D. Conn. Dec. 11, 2012) (citing Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993)). Dr. Golkar and Dr. Khan's opinions are not entirely supported by the evidence in the record.  After an extensive review of the record, the Court is unable to find any evidence that supports the non-examining consultant's conclusion that plaintiff can sit or stand for six hours in an eight hour workday.  For example, plaintiff testified that he is unable to stand or sit for more than a half hour before experiencing pain. (Tr. 52-53).  In his activities of daily living questionnaire, plaintiff also indicates that he cannot stand for a long time. (Tr. 220).  Although not before the ALJ, Dr. Pilagin's opinion also undermines Dr. Golkar and Dr. Khan's opinions, by finding that plaintiff can sit or stand for three hours in an eight hour work day, with breaks. (Tr. 836).  In March 2007, plaintiff reported to his doctor at Connecticut Spine and Sports that his sitting tolerance was one to two hours, and his standing tolerance a half an hour to an hour. (Tr. 818).  Dr. Golkar and Dr. Kahn's opinions with respect to plaintiff's ability to "frequently" climb stairs are

also not supported by the record.  Plaintiff testified that he
has difficulty with the stairs in his home. (Tr. 53-54).
Moreover, after his seizure episode, plaintiff was "strongly
advised" not to use stairs "because of his body habitus,
questionable ongoing seizure activity and multiple medial
problems." (Tr. 346).

The regulations provide that generally more weight is given
to an examining medical source, than to a non-examining medical
source. 20 C.F.R. 404.1527(d)(1).  "[W]hile the findings of non-
examining analysts can, and often do, provide valuable
supplemental support for an ALJ's decision, they should
generally be afforded relatively little weight in the overall
disability determination." Freegard v. Astrue, 1:11-CV-12, 2011
WL 4915744, at *7 (D. Vt. Sept. 20, 2011) report and
recommendation adopted, 1:11-CV-12-JGM, 2011 WL 4915740 (D. Vt.
Oct. 17, 2011) (citing See Vargas v. Sullivan, 898 F.2d 293,
295-96 (2d Cir. 1990) ("The general rule is that ... reports of
medical advisors who have not personally examined the claimant
deserve little weight in the overall evaluation of
disability.")). Drs. Golkar and Khan never examined plaintiff,
and instead relied solely on the medical records in the
administrative record to form their opinion.  See, e.g., Pratts
v. Chater, 94 F.3d 34, 38 (2d Cir. 1996) (a doctor's assessment
of another doctor's findings merits little weight in a
disability determination).  By contrast, Dr. Schwarz had a

significant treating relationship with plaintiff.  Accordingly,
"[t]he ALJ should have at least acknowledged this difference and
considered its effect on the comparable weight of the medical
opinions."  Freegard, 2011 WL 4915744, at *7.

Therefore, this matter is remanded for the re-weighing of
the medical evidence.  On remand, the ALJ should also consider
the opinion of Dr. Pilagin which, although not a part of the
record at the time the ALJ rendered his opinion, is now medical
evidence of record.  (Tr. 832-74).

## 2.   Credibility Determination

Next, plaintiff argues that the ALJ erred in assessing his
credibility. Specifically, plaintiff argues that the ALJ's
findings with respect to his credibility are not supported.

The ALJ is required to assess the credibility of the
plaintiff's subjective complaints. 20 C.F.R. § 416.929.  The
courts of the Second Circuit follow a two-step process. The ALJ
must first determine whether the record demonstrates that the
plaintiff possesses a medically determinable impairment that
could reasonably produce the alleged symptoms.  20 C.F.R.
§416.929(a) ("[S]tatements about your pain or other symptoms
will not alone establish that you are disabled; there must be
medical signs and laboratory findings which show that you have a
medical impairment(s) which could reasonably be expected to
produce the pain or other symptoms alleged and which, when
considered with all of the other evidence (including statements

about the intensity and persistence of your pain or other
symptoms which may reasonably be accepted as consistent with the
medical signs and laboratory findings), would lead to a
conclusion that you are disabled."). Second, the ALJ must assess
the credibility of the plaintiff's complaints regarding the
intensity of the symptoms. Here, the ALJ must first determine if
objective evidence alone supports the plaintiff's complaints; if
not, the ALJ must consider other factors laid out at 20 C.F.R.
§416.929(c). <u>See, e.g.</u>, <u>Skillman v. Astrue</u>, No. 08-CV-6481, 2010
WL 2541279, at *6 (W.D.N.Y. June 18, 2010).   These factors
include activities of daily living, medications and the
plaintiff's response thereto, treatment other than medication
and its efficacy, and other relevant factors concerning
limitations.   20 C.F.R. § 416.929(c)(3)(i)-(iv).   The ALJ must
consider all the evidence in the case record.   SSR 96-7p, 1996
WL 374186, at *5 (Jul. 2, 1996).   Furthermore, the credibility
finding "must contain specific reasons . . . supported by the
evidence in the case record, and must be sufficiently specific
to make clear to the individual and to any subsequent reviewers
the weight the adjudicator gave to the individual's statements
and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at
*4.

Despite plaintiff's arguments to the contrary, here the ALJ
cited evidence from the record to support his finding that
plaintiff's testimony regarding the intensity and persistence of

his symptoms was inconsistent with the medical record. (Tr. 29-32).  The ALJ undertook a thorough review of the medical evidence of record, which he found did not support the extent of the limitations alleged by plaintiff.  While the ALJ's findings are, therefore, not subject to reversal here for failure to "provide specific reasons for finding a claimant's testimony not credible," Malloy v. Astrue, 2010 WL 7865083, at *29 (D. Conn. Nov. 17, 2010), the fact that the ALJ relied on evidence on which he placed improper weight is.  Therefore, to the extent that the ALJ's credibility determination relied on the non-treating, non-examining sources, the ALJ should reconsider the weight placed on such evidence on remand.  Moreover, on remand, the ALJ should consider the October 2011 MRI which, although not part of the record at the time of his decision, is now medical evidence of record.[52]

In light of the Court's findings above, it need not reach the merits of plaintiff's remaining arguments.  Therefore, this matter is remanded to the Commissioner for further administrative proceedings consistent with this Ruling.

---

[52] To the extent that plaintiff argues the ALJ erred by concluding Mr. Johnson engaged in drug seeking behavior, the Court disagrees.  Despite plaintiff's arguments to the contrary, and as summarized above, the record is rife with statements of concern about plaintiff's narcotic use.  By way of example, Windham Hospital Emergency Department records indicate that plaintiff had a history of "massive doses of opiate medications with opiate dependence as well as abuse." (Tr. 346). Connecticut Spine and Sports records also note that plaintiff was "exhibiting medication dependence and has been demanding" narcotics. (Tr. 827).

VI.        CONCLUSION

For the reasons stated, plaintiff's Motion for Judgment on the Pleadings **[Doc. #10]** is **GRANTED in part and DENIED in part** and the Commissioner's Motion to Affirm is **DENIED [Doc. #12].** This is a Recommended Ruling. See Fed. R. Civ. P. 72(b)(1). Any objections to this recommended ruling must be filed with the Clerk of the Court within fourteen (14) days of being served with order.  See Fed. R. Civ. P. 72(b)(2).  Failure to object within fourteen days may preclude appellate review.  See 28 U.S.C. §636(b)(1); Fed. R. Civ. P. 72(b); and D. Conn. L. Civ. R. 72.2; Small v. Secretary of H.H.S., 892 F.2d 15 (2d Cir. 1989)(per curiam); F.D.I.C. v. Hillcrest Assoc., 66 F.3d 566, 569 (2d Cir. 1995).

Dated at Bridgeport, this 19th day of February 2014.


_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE